County, and I'm going to turn it over to the Attorney General. Thank you, Your Honor. May it please the Court, there are two fundamental departures from the norms of removal that make Federal Officer jurisdiction the most efficient vehicle to reach the correct decision in this case. First, while in most removal cases, deference is given to the State Court jurisdiction and to the ideas of remand, in Federal Officer jurisdiction we know that the opposite is true. Deference is given to retained jurisdiction in the Federal Courts where the officer can present his or her colorable defense. The second reason, perhaps the more important reason, that Federal Officer jurisdiction is the most efficient route, is that while in most cases with a well-pleaded complaint rule, the plaintiff is the master of his complaint, or her complaint, and their allegations are taken as de facto true. In Federal Officer jurisdiction in the Jefferson County v. Akers case, as well as others, it's the opposite. The allegations, the view of the case presented by the removing party, or the defendant in this case, is given deference. In that Jefferson County case, you'll recall there were Federal judges who were in Georgia, and the county was attempting to impose an occupation tax on the judges. And the judges in the State Court, they were bringing an action to collect these, this occupation tax. The judges were moved to the Federal Court, and the question was raised, is this action against the judges one that's under, or color of title, or color of office, sorry, I apologize. And the county argued that, no, it was not, it was just brought against them in their individual capacities. There were attorneys who were practicing in the city, or the county, and therefore they owed the occupation tax, and they were just trying to collect the tax. And the judges said, no, this is an enforcement action brought against us for conducting our Federal role as judges in this county, and therefore it does arise under our color of office. And the Supreme Court said that we don't accept the county's view of what the allegations say. We accept the removing party, the Federal officer's view of what the allegations are in this case, and what they mean. And that matters in this case because when we're looking at the application of the PREP Act, for example, under our colorable defense, we have to decide, is the, is there a covered countermeasure? Is there an administration in use of the covered countermeasure? And is the defendant, is the nursing home in this case, a qualified person? And the plaintiff will tell you that there is no covered countermeasure in this case because their allegations don't say anything about covered countermeasures, and they don't talk about an injury occurring because of administration in use of a covered countermeasure. But going back to the Federal officer removal statute, we know that in Jefferson County that we credit the nursing home's view of what's included in the plaintiff's complaint. And as we outlined in our reply, as we went through all of these specific allegations that the plaintiff made in their complaint, and we identified which processes and the related devices that are covered countermeasures would relate to each one of those. Just for example, screening. The plaintiffs will argue that screening procedures are just that, they're just procedures, and the PREP Act doesn't apply to processes. And we would say yes, but the processes for screening at a nursing home include taking temperature using a thermometer, which is a covered countermeasure. It may involve actually doing a test, which may involve the, the antibody tests that are also under emergency use authorizations, covered countermeasures. So, when you view the plaintiff's allegations giving deference to the defense that's being asserted by the Federal officer, you see that they do incorporate necessarily these elements of the PREP Act in the, in the coverable defense. Now the other area in which the Federal officer jurisdiction question becomes controversial with the plaintiffs is whether or not the nursing home's actions here were arising under a Federal officer, and the Federal officer being the Department of Health and Human Services, the Center for Medicare and Medicaid Services, and the Center for Disease Control, who all issued guidelines, suggestions, best practices all throughout this pandemic to nursing homes and other health care providers. Counsel, would Southeast be acting under Federal direction in normal times? I mean, it's a highly regulated entity. It's clearly answerable to a number of Federal agencies and regulations and all that sort of thing. Where's the line here? The line comes from Watson. You know, in that case, Justice Breyer, who writes very layered, nuanced opinions, he discussed particularly, he started off with three previous Supreme Court decisions discussing Federal officer jurisdiction and what it means to arise under a Federal officer's direction of control. Davis v. Tennessee, Maryland v. Socor, and another Davis v. South Carolina. And those three cases kind of outlined the universe of possibilities for arising under. And after he goes through the facts of those cases, what he decides is, you have to have this relationship of a superior-inferior, you know, agency telling the nursing home, Southeast, how to practice, what the best practices are, what their guidelines are. There has to be that kind of relationship. But there also has to be an effort beyond mere statutory, beyond mere regulatory compliance that Southeast is engaging in to assist the Federal agency, the Federal officer, to perform its policies, duties, the things that the Federal government is trying to accomplish. And under normal times, I agree with you, when Southeast is just operating as a nursing home and they're just doing their regular day-to-day business and they're just under the regulations, they only satisfy one of those requirements because they are in an inferior position to HHS and CMS, but they aren't doing anything above and beyond to assist. But are you saying that everybody, every entity that's going above and beyond during the pandemic is now a Federal officer or acting under one? I'm not. Because a lot of those entities, they may satisfy the element of their assisting. So, for example, my law firm, we enacted protocols trying to prevent the spread. So, your question is, were we, are we a Federal officer? No, because we are under HHS and CDC and CMS in the same way that a nursing home is. So, we may satisfy one element, but we don't satisfy the other one. And that's true for a lot of private companies out there, a lot of entities who are, who engage in things like this, who try to help things out. American Airlines or some of the airlines, they started enforcing vaccine mandates, maybe it wasn't American, on their employees before there ever was any kind of regulation on that. There again, Counselor, I mean, the airlines are doing it per directives of the executive branch from various sources. Interstate travel, interstate commerce, lots of things seem to fit under Southeast Theory, so I'm struggling with the line here. They might be, Your Honor. I would just say that they're not acting under HHS, CMS, or CDC regulation, but if they're only relying on CDC guidelines or HHS guidelines, then I would say they're not, they don't have that relationship with the Federal officer the nursing home has. What about employers above 100 employees who are basically being told by the Federal Government they have to get jabbed or get fired? If, you know, once OSHA, if OSHA's regulation is upheld, which I understand is a challenge, then any compliance with that regulation would be compliance with regulation, and it would fall under the Watson issue of if all you're doing is following the rules, then you're not going above and beyond. So it does, there is a little bit of nuance there. A lot of this behavior we're talking about in this case was in the very early days of this pandemic. No one knew exactly what was going on. It was March, April 2020. There weren't regulations in place like the OSHA regulation. There wasn't a vaccine. There weren't even treatments everybody knew about that definitively worked. So everyone was trying to do the best they could to follow the guidance they were given, which changed from time to time. I don't know if you recall, Hydra, what's it, Hydra, Hydrochloroquine was a malaria treatment that early on was, everybody thought was the thing to do, and there was emergency use authorization to allow people to use that, and people did. But then later on in July, that was revoked because they decided that maybe the risks outweighed the benefits. So these guidelines changed, and people like Southeast Acting, pursuant to their relationship with HHS, CDC, and CMS, were attempting to assist these federal officers in a nationwide effort to control this pandemic and to mitigate the effects of it. And that's where we are in a different situation from normal times, normal compliance with infectious disease protocols and things like that. We're kind of in the new frontier a little bit. And obviously as time passed, they started defining the borderlines of that, and we started getting regulation. There were regulations passed affecting nursing homes later after all these events had occurred regarding vaccination employees and things like that, dealing with infectious disease protocols that... Council, you seem to have, as I looked through these papers, that you had a little of a classic complete problem of a pleading problem, a well-pleaded complaint rule, dated in no small part back to the famous modeling case and coming forward. That doctrine is still out there. It's very powerful, and for good reason. And the complete preemption doctrine is one that's really tough to peddle, and I appreciate your brief statement about as well as I could. And I'd like to address complete preemption as well. Thank you. I want you to help me with that, and then you fall back, of course, as I expect you to, to Grable and those line of cases, despite that, whether you have an overarching present constitutional issue, et cetera, et cetera. But those are the two steps that are critical to me in any event. So help me a little bit with those. Yeah, Gary, and complete preemption is an alternative way to get into the federal court in this case and to not be remanded. And if you recall from the beneficial national bank case, there's two elements there have to be. There has to be a statute that creates an exclusive federal cause of action, and it has to set forth procedures and remedies governing that cause of action that basically take the place of what a state action would be. And that's what the PREP Act does there. If you look at section 247D-6D, that's the operative section, and it begins in subsection A with this idea that subject to the other subtitled subprovisions of section 247D-6D, there's immunity from suit. And immunity from suit is a document in Texas, in Texas state courts, also in federal courts, is a phrase that comes out of, for example, sovereign immunity cases. And it's called also jurisdictional immunity. And the basic idea of it is that it removes subject matter jurisdiction. So the very first provision, the very first subsection of 247D-6D, strips subject matter jurisdiction of all the courts, of any suit that the PREP Act would apply to, where there was a declaration by the secretary, where there was a person who used or administered a covered countermeasure. And when that action, that conduct, gives rise to the claim, or at least part of the claim, that is being alleged against them. But if it's a straight-up state law negligence claim, that doesn't, that immunity wouldn't apply, would it? It absolutely would. That immunity says in state and federal court, all suits, there's immunity from suit. Well, all suits related to countermeasures that are ordered by the declaration by the HHS secretary, correct? Right. In all suits that are related, if those suits are negligent, for example, in this case, and we talked about this in our reply as well in our brief, in this case where the covered countermeasures, they're written very broadly. They incorporate a lot of different conducts, some of which may just be normal care in the course and scope of medical care, and some of which are specific things that happened during this pandemic. For example, the screening using covered countermeasures that are devices that are approved or cleared by the FDA. And, uh, I'm about to run out of time. But, um, so I apologize. Your memory turned off at the same time the clock did. The timer got me. All right, well, you deserve a drink. You're in good shape. Thank you, Eric. Good afternoon, your honors. May please the court Adam pulver for the FLEs. Uh, as the third circuit held in Maglioli, there is no covert 19 exception to federalism and covert 19 did not change the basic frameworks of all the doctrines we're discussing about here today. As to federal officer removal, I agree with the opposing counsel that this case begins and ends with Watson. Watson says regulation is not enough to make someone a federal officer and bring them under the acting under prompt. If regulation is not enough, it's hard to see how sub regulatory guidance, which is all that is issued in this case, uh, can do so. There's the assertion that there was some sort of special, um, deference that we have to give to, uh, the, the defendant's view of the case here, but it's not quite that it's not deference. It's that we do accept some of the allegations made in the notice of removal, but the notice of removal here could have included allegations perhaps about some sort of special relationship between the nursing homes and the federal government. But the only thing cited are sub regulatory guidance, most of which is actually says work with your state department of health. That is not the special relationship with the federal government that Watson makes clear is necessary. And post Watson that this court has made clear, uh, in the St. Charles case, uh, the court discussed the idea and judge Wilson in the recent St. Charles two, uh, case that we look at this relationship between the essence of the relationship between the private actor and the federal government. And as we were just discussing, as the court was just discussing that special, that relationship did not change when CMS simply issued more guidance. CMS issues guidance all the time. People complain about that guidance. They bring lawsuits about the guidance of this court all the time. It didn't change the nature of the relationship. I think turning to the prep act, which I think is part of both the federal officer and the complete preemption, the issue isn't whether the prep act provides an exclusive cause of action. We know it provides a exclusive cause of action. It says so in the statute, but that exclusive cause of action does not apply here. The plain language of the statute, and this is subsection, uh, a to B says the entire statute, the immunity included only applies to a claim that quote for loss that has a causal relationship with the administration to or use by an individual of a covered counter measure. So it doesn't matter that this case may be in some world could have been related to some covered counter measure that someone didn't use somewhere. This is a case about that. There's no one in this. There is no allegation in the complaint or in the notice of removal that any of the deaths of the 18 people who died at this nursing home was because of how a covered counter measure was administered to or used by someone. And if you read throughout the statute is quite clear that the point of this statute is if something bad happens, when you are doing the administration, when you are using this covered counter measure, giving the vaccine, applying the, giving the drug, if something happens and that there's a side effect, there's something goes wrong, you are protected. It is designed to encourage the use of covered counter measures. It is not to give you blanket immunity to decide whether or not you use covered counter measures. What about counsel's point that, that the immunity would encompass negligence claims that are related to the counter measures? What's the, what's the chain there? Where does it break? The problem is that the statute does not say relating to covered counter measures. It says relating to the administration or use of a covered counter measure is the, the primary. And then if you read the other sections where then the conditions that are provided, and this is subsection three of the statute says the immunity only applies where one, the counter measure was administered or used during the effective period. B, where it was used for the, administered or used for the category or categories of disease. So the statute only makes sense if the administrator, the, that the counter measure was administered or used. So failure to use. It wouldn't make sense in the statute. If you read the statutory provision, you know, talking about whether the use was consistent, the person had a license to use it. Why would it matter if there was a license to use it if you didn't use it? That just wouldn't make any sense. And, uh, you know, if you go further in the section on the, uh, exclusive cause of action, it's even more clear because it says that to have that cause of action, you must allege that the covered counter measure was administered to or used by the person on whose behalf the complaint was filed and that the, uh, that was a, uh, prox, the proximate cause of the injury. And, you know, in the regulations, which, uh, secretary, uh, the secretary of HHS has promulgated has made clear that you cannot bring a claim for one of these injuries if you died of COVID-19 or, or whatever the countermeasure was designed to prevent. That's not what this is about. Those are excluded from what's defined as a covered injury. A covered injury is something that happens as a result of the countermeasure being used. Uh, no one here died because of the countermeasure. They died of COVID-19. And so it just wouldn't make sense to, if you read all the provisions of the statute, which are really to encourage use to say they equally apply to all, uh, non-use. And, and while there is, you know, the well pleaded complaint rule doesn't apply in complete preemption, the presumption against preemption still does. And this court has in the complete preemption context, many times reaffirmed that we strictly construe statutes that take away powers from the states. And this is a classic public health power to regulate the professions, uh, medical malpractice, uh, and of that sort. Uh, we also keep in mind that in this case, there are classic medical malpractice allegations that have nothing to do with prevention of COVID-19. Uh, there's extensive claims are about how COVID-19 was treated and the failure to take adequate medical care post diagnosis. There is no suggestion in the notice of removal or in any of the briefs that that relates to something that falls under the PREP Act. Uh, further about, uh, the, the structure of the, uh, statute, I think it goes to the question of, uh, whether it is consistent, uh, with the, the statutory languages we just discussed, but, you know, and I know we would take the position that the, the language is quite clear in the statute that doesn't apply to, to use, but even the administrative authority that, uh, the other side has relied upon, I think actually supports our view to the extent that it's acknowledges that nonfeasance, uh, is not, uh, covered by the PREP Act. And here that is essentially what has been alleged by the plaintiffs. And again, there could have been, if there were facts in the notice of removal suggesting that these claims were actually about the misuse of, uh, of, of, uh, covered countermeasures or, um, what the HHS had said was purposeful allocation, uh, that might be a different category. But here, even there, someone has had a covered countermeasure administered to or used by them, which is a, that's what the text of the statute requires. Uh, briefly, um, just, you know, addressing the issue that was raised at the, by the Maglioli decision, uh, in the Maglioli decision, um, the federal officer, uh, I think was straightforward, uh, analysis based on Watson, um, as, as we, uh, urge here. Uh, the complete preemption, the court did not reach some of the questions that, that we're asking the court to reach here and kind of just evaded the question of whether the PREP Act applies at all and simply said, we don't need to get there because this isn't a willful misconduct claim. And we certainly agree here, this is also not a willful misconduct case. So certainly the, uh, path chosen by the Maglioli court, uh, is certainly available. Um, but we think that it's an independent reason that the statute has no application whatsoever as the district court here ruled and, and the majority of the district courts, um, in the country. In fact, all the district courts, uh, within this circuit, um, that have addressed the issue. Uh, if the court doesn't have any other questions. All right. Thank you, sir. Thank you. All right. Mr. Bush, if you reserve some of your ball time. Yeah, I'd start with the, just a brief comment on the federal officer jurisdiction. We obviously have a disagreement here about whether this is near regulation or not. I think I made my position clear on that, that we're, this is beyond mere regulation when you're talking about a global pandemic and national response that we're trying to address. But I'll leave that for a minute. Um, but he also mentioned the St. Charles decision talking about the relationship. Now, I do agree, and I think I said that in my first part of the argument, that the relationship is a significant factor. That's one of the elements from Watson. There has to be this relationship from HHS, CMS, CDC with the nursing home. And that does exist in this case. Going on to the complete preemption points that, uh. Counsel, before you leave the federal officer, um, question, what about Maglioli? And there's about a couple dozen district courts who go the other way too. So what, you say it's nuanced. Apparently they've all missed it also. So what do we do with those cases? Well, you know, I, I, I struggle trying to understand the Second Circuit decision because going back to, I guess probably your question before the break, um, about what about the exclusive federal cause of action and the negligence claims. And in Maglioli, the Second Circuit said there is no exclusive federal cause of action in the statute. And when you read 247d6d as a whole, which you do under statutory construction principles, there is an exclusive federal cause of action. There's part, subpart A that creates immunity from suit for certain claims, for, for, for, for suits that involve certain claims. And then you have, and so, so that wipes the slate clean. There are no claims. There are no suits that can be brought. It's jurisdictional also. The, the, the state courts don't have subject matter jurisdiction over this. And, and that's a, that's an element of a plaintiff's case that he has to prove, uh, which kind of goes to the grable issue. Um, and then, and then subsection D says the sole exception to immunity from suit in subsection A is this exclusive federal remedy for, uh, willful misconduct. And that's it. That's, that's your only claim you can make. If the plaintiffs say they didn't make that claim, then our 12b6 motion in the federal court should be granted once we get back there. Oh, but plaintiffs, plaintiffs say that, um, it, that, that the scope of that immunity doesn't go to nonfeasance. In other words, you've got to, you've got to have been injured while a countermeasure was being administered while a countermeasure was being employed. And what's at issue here really is the lapse or lack of those things. And that's my next point. Um, under the plaintiff's view of what administration use means, it's essentially the needle stick. That's the only time when the statute applies is when you're, you're, that you get the vaccine, it's put in your arm. Or you get a, uh, a biologic remedy or some other kind of, uh, device administered to you and it's put in your mouth or put in your bloodstream or, or, or whatever, however it might be introduced to the person. And, and that's not how the statute defines and that's not how the, uh, the secretary defines administration use. Uh, the, the statute, uh, in B1, which is the, B is the section that deals with the declaration the secretary may issue. And in B1 says that when he issues the declaration, it's under such conditions as the secretary may specify. And it is in effect with respect to the activities so recommended. And when the secretary issued his first declaration in March 17th, 2020, Roman numeral 9 of that declaration explained what administration was. And he, and, and in doing so, he followed Congress's mandate to him to explain what the conditions are that the secretary will specify to which the covered countermeasures apply. And he defined the activities that are recommended. And he said that it includes, that administration includes activities and decisions directly related to public and private delivery, distribution, and dispensing of the countermeasures and to management or operation of countermeasure programs, which is what the nursing home, in this case, Southeast was doing. They were administering these covered countermeasure programs with their screening programs, with their testing processes, with the patients, with their staff, with, uh, if there are any kind of outside contractors who are coming to give care with them. Uh, and also in their treatment programs, whatever treatment regimens they put into place that involve devices, such as, uh, well, like I said, the testing, the analytic testing that is a covered countermeasure. Those are all, that's all administration. Congress asked the secretary to define what administration was and he did. Got me again. All right. Thank you, Your Honor. All right. We appreciate the briefing and argument from both sides. Case will be submitted and we will get it decided. Thank you. All right. This concludes the argued cases that we had for this afternoon.